UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ADOMNI, INC.,                                          :

                            Plaintiff,           :         23-CV-10338 (DEH)

       -against-                                         :
                                                                        **FIRST AMENDED**
CLEARTRUST MEDIA LLC and CT                    **COMPLAINT**
MEDIA, LLC,                                              :

                         Defendants.       :         **JURY TRIAL DEMANDED**

------------------------------------------------------------------x

      Plaintiff Adomni Inc. ("Adomni"), by its undersigned counsel, as and for its First Amended Complaint, alleges as follows:

## THE PARTIES

      1.    Plaintiff Adomni is a Delaware corporation with its principal place of business at 7120 Rafael Ridge Way, Las Vegas, Nevada 89119.  Adomni operates a service that enables its clients to buy advertising space on digital out-of-home screens.

      2.    Upon information and belief, Defendants Cleartrust Media LLC and CT Media, LLC (collectively, "CTM") are Wyoming limited liability companies with their principal place of business at 30 N. Gould St., Suite 12737, Sheridan, Wyoming 82801.  Upon information and belief, CTM is a media managed services organization that is engaged in the purchasing of advertising space for its clients on digital out-of-home screens.

      3.    Upon information and belief, CTM's members are Habib Khoury, a citizen of New York; Michael Adler, a citizen of New York; Lawrence Grella, a citizen of Oregon; and Steven Van Blarcom, a citizen of Florida.

32240/003/4630386.1

## NATURE OF PROCEEDING

4. Adomni brings this action for injunctive relief and to recover damages suffered as a result of CTM's violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* and its misappropriation of trade secrets, tortious interference with contract and breach of contract under state law.

## JURISDICTION AND VENUE

5. The Court has jurisdiction of the claim under the Defend Trade Secrets Act pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). The Court has jurisdiction over all claims based on diversity of citizenship, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The Court also has jurisdiction over the state law claims pursuant to principles of supplemental jurisdiction.

## FACTS COMMON TO ALL CLAIMS

**Nature of Adomni's Business and Importance of Proprietary Customer Information**

6. Adomni operates an online platform that enables marketers to easily build and launch digital out-of-home campaigns where ad space is sold through real-time bidding networks.

7. Because the market for digital ad space in which Adomni operates is so competitive, it heavily invests in its partner relationships, customers, and its marketing to obtain a competitive advantage.

8. The information and data regarding Adomni's accounts are not generally known to the public and derive independent economic value from not being generally known or readily ascertainable through proper means by third parties. Such client data includes clients' past spend amounts or proposal histories, client preferences regarding campaign setups and reporting and

other details of the clients' working relationship or quantitative data, including budgets, profit margins, forecasts, marketing plans and business plans (collectively, "Adomni's Client Data").

9. Adomni's Client Data is a critical business asset which Adomni treats as trade secrets. It takes appropriate measures to protect such information from disclosure by, among other things, enforcing a strict confidentiality policy and non-solicitation policy on its employees and utilizing secure computer and other systems. The unauthorized sharing of Adomni's Client Data with outside consultants or competitors undermines Adomni's business and damages the company's earnings potential and the relationships in which it has invested significant time and costs.

**Adomni's Prior Relationships with Van Blarcom and Grella**

10. Adomni hired Steven Van Blarcom as Adomni's Senior Vice President of Growth and Business Development on or about June 1, 2021.

11. Van Blarcom's employment was conditioned on signing an Employee Proprietary Information and Inventions Agreement (the "Van Blarcom Agreement"). Pursuant to the Van Blarcom Agreement, Van Blarcom agreed not to disclose any of Adomni's proprietary information, including trade secrets and other nonpublic information having commercial value, to anyone outside Adomni, and to only use and disclose any proprietary information as necessary to perform his duties as an employee of Adomni.

12. Pursuant to the Van Blarcom Agreement, Van Blarcom also agreed that for a period of one year following his employment with Adomni, he would not solicit, either directly or indirectly, separately or in association with others, any of Adomni's customers that he serviced during his employment with Adomni for purposes of diverting or taking away business from Adomni, and would not otherwise interfere with, impair, disrupt or damage Adomni's

32240/003/4630386.1

relationships with any such customers for purposes of diverting or taking away business from Adomni.

13. Pursuant to the Van Blarcom Agreement, Van Blarcom also agreed that after the termination of his employment with Adomni, he would not disparage or cause others to disparage Adomni, its products, services, reputation, business practices or conduct, agents, shareholders, officers or employees.

14. In his role as Senior Vice President of Growth and Business Development, Van Blarcom regularly communicated with Adomni's customers/partners and received privileged access to Adomni's Client Data in order to service those of Adomni's accounts on which Van Blarcom worked.

15. Van Blarcom was terminated on or about July 29, 2022 after regularly failing to meet his sales targets.

16. Adomni hired Lawrence Grella as Adomni's Vice President of Sales and Marketing on or about August 13, 2018.

17. Grella's employment was conditioned on signing an Employee Proprietary Information and Inventions Agreement (the "Grella Agreement"). Pursuant to the Grella Agreement, Grella agreed not to disclose any of Adomni's proprietary information, including trade secrets and other nonpublic information having commercial value, to anyone outside Adomni, and to only use and disclose any proprietary information as necessary to perform his duties as an employee of Adomni.

18. Pursuant to the Grella Agreement, Grella also agreed that for a period of two years following his employment with Adomni, he would not solicit, either directly or indirectly, separately or in association with others, any of Adomni's customers that he serviced during his

employment with Adomni for purposes of diverting or taking away business from Adomni, and would not otherwise interfere with, impair, disrupt or damage Adomni's relationships with any such customers for purposes of diverting or taking away business from Adomni.

19. Pursuant to the Grella Agreement, Grella also agreed that after the termination of his employment with Adomni, he would not disparage or cause others to disparage Adomni, its products, services, reputation, business practices or conduct, agents, shareholders, officers or employees.

20. In his role as Vice President of Sales and Marketing, Grella regularly communicated with Adomni's customers/partners and received privileged access to Adomni's Client Data in order to service those of Adomni's accounts on which Grella worked.

21. Grella voluntarily resigned from Adomni on or about April 18, 2023.

**Adomni's Relationship with CTM**

22. Following Adomni's termination of its employment relationship with Van Blarcom, he expressed an interest in continuing to work with Adomni on a consulting basis. He indicated that he believed such an arrangement could prove mutually beneficial because he could direct new customers to use the Adomni platform, which he considered to be top-quality in the industry.

23. Adomni agreed to see if such an arrangement could work, and as a result entered into a Media Service Agreement effective as of April 7, 2023 (the "CTM MSA") with CTM, the new company which Van Blarcom had joined. Although the purpose of the CTM MSA was for Adomni to develop new sources of business, the parties began their relationship by permitting CTM to purchase advertising on behalf of two clients, Hershey, which had previously done business with Adomni, and Butler/Till, Inc. ("Butler/Till"), which had signed a Media Services

Agreement with Adomni in January 2023 with the expectation of spend beginning in May 2023. Both of these client accounts had Van Blarcom assigned as a sales representative in the past, while he was an employee or sales rep consultant for Adomni.

24. Pursuant to the CTM MSA, Adomni agreed to make available to CTM a service through which CTM could purchase advertising inventory on digital out-of-home screens.

25. Pursuant to the CTM MSA, Adomni agreed to invoice CTM, on a calendar monthly basis, for all impressions purchased during the prior calendar month.

26. Pursuant to the CTM MSA, CTM agreed to pay all invoices within 60 days of the invoice date; provided, however, that if proceeds had not cleared to CTM from specific buyers for certain impressions placed in accordance with the CTM MSA, CTM would not be responsible or liable for such payments until such time as the proceeds had cleared from the applicable buyers to CTM.

27. Pursuant to the CTM MSA, CTM placed an insertion order with Adomni on behalf of Horizon Media, the advertising agency for Hershey, for an advertising campaign titled "Hersehey – 2023 Equity Milk" (the "Hershey Campaign") to run on certain out-of-home screens between May 15, 2023 and July 9, 2023 at a total cost of $675,000 to deliver 66,352,638 impressions.

28. Adomni over-delivered the quantity of impressions in the insertion order on behalf of CTM's buyer by 2,789,468 impressions (69,142,106 total impressions delivered), and CTM's buyer paid CTM the full amount owed for the Hershey Campaign.

29. Pursuant to the MSA, Adomni issued monthly invoices to CTM in June, July and August 2023 in the total amount of approximately $675,000 for the impressions purchased during the preceding month in connection with the Hershey Campaign.

32240/003/4630386.1

30. CTM never disputed the amounts reflected in the invoices or in any way challenged the fact that the invoices accurately reflected the advertising inventory that had been purchased by CTM and delivered by Adomni.

31. However, notwithstanding that CTM has received the proceeds from its buyer for the purchase of the Hershey Campaign, and was thus obligated under the MSA to pay Adomni's invoices, CTM has never paid such invoices.

32. Instead, CTM directly contacted Adomni's supply partner, Place Exchange, located in New York, in order to determine the amount of money that Place Exchange was to receive from Adomni for the cost of the impressions placed in the Hershey Campaign once Adomni's invoices to CTM were paid.

33. CTM had no direct contractual relationship with, or obligation to, Place Exchange with respect to the advertising inventory purchased by CTM.

34. Nevertheless, CTM paid $535,916.55 to Place Exchange for the impressions placed in the Hershey Campaign so that CTM could then avoid paying Adomni the fee to which Adomni was entitled to retain for itself upon CTM's payment of the invoiced amounts.

35. Despite Adomni's demands, CTM has refused to pay any funds to Adomni for the impressions placed in the Hershey Campaign, thereby damaging Adomni in the amount of $139,038.45 (the difference between the $675,000 invoiced to CTM pursuant to the CTM MSA and the $535,916.55 that CTM paid to Place Exchange and that Adomni would have been obligated to pay to Place Exchange itself had CTM paid the amounts owed to Adomni for the impressions placed in the Hershey Campaign).

**Van Blarcom's and Grella's Breaches of Their Agreements with Adomni and CTM's <u>Misappropriation of Adomni's Trade Secrets</u>**

36. Sometime after resigning from Adomni on April 18, 2023, Grella joined CTM.

37. In the summer of 2023, Adomni learned that in violation of their agreements with Adomni, Van Blarcom and Grella, through CTM, were soliciting Adomni's customers that they had serviced while employed by Adomni in an effort to divert business from Adomni. For example, Grella placed calls to two individuals at one of Adomni's largest clients, TikTok, and solicited them to move their business away from Adomni to CTM and its partners, such as Talon Outdoor.

38. Adomni also learned at that time that in violation of the no disparagement clause of their agreements with Adomni, Van Blarcom and Grella were making defamatory statements about Adomni to Adomni's customers, including that Adomni did not pay its bills and was going out of business, and Van Blarcom and Grella also informed Adomni's customers that CTM was willing to provide substitute services. For example, Grella's calls to TikTok referenced in paragraph 37 above included such disparaging statements.

39. Upon learning of Van Blarcom's and Grella's conduct, Adomni determined that it was no longer feasible to work with CTM. Adomni sent written notice to CTM on July 21, 2023 of its termination of the CTM MSA, and also provided written notice that pursuant to the Service Level Agreement and Fee Structure section of the CTM MSA (Partnership Elements), which provided Adomni "full discretion to revoke access to specific CTM individuals or affiliates (contractors and subcontractors) for any reason," it was invoking its absolute right to revoke access to its platform to Van Blarcom.

40. As of the time that Adomni ceased working with CTM, the Hershey Campaign had been completed and a Butler/Till campaign on behalf of State Farm Insurance was ongoing. There were no other active spending business transactions involving Adomni and CTM as of that time, as CTM had never brought any net new clients to Adomni.

32240/003/4630386.1

41. Adomni contacted Butler/Till in July 2023 and explained that it would no longer be working with CTM. Adomni's CEO, Jonathan Gudai, spoke with Butler/Till's Group Director, Channel Activation – Ryan Lammela, and presented Butler/Till the option of determining how it wanted to complete the State Farm campaign, including whether it wished to continue working with CTM and have CTM invoice it directly, or have Butler/Till proceed under the pre-existing Media Services Agreement with Adomni, which it had entered into as of January 27, 2023 prior to the CTM MSA. Adomni also offered Butler/Till the option of having a group meeting with CTM and Adomni to discuss a transition.

42. Butler/Till informed Adomni that it never thought its arrangement with CTM made any sense or added any value, and that it preferred to work directly with, and be invoiced by, Adomni. Butler/Till also assured Adomni that it had no existing contractual commitment to CTM, and that it had never placed any insertion orders with CTM committing it to place any advertising through it.

43. As a result, Adomni worked directly with Butler/Till on completion of the State Farm campaign and invoiced Butler/Till directly for the remainder of the campaign.

44. As of the time that Butler/Till made its decision to cease working with CTM, CTM had issued a single invoice to Butler/Till in connection with the State Farm campaign. The amount of that CTM invoice represented the exact amount that Adomni had invoiced CTM for the impressions placed in May 2023 as part of the State Farm campaign, without any mark-up or profit for CTM. CTM had simply reproduced all the details of Adomni's invoice to it and substituted the names of the parties so that it was billing CTM the same amount it had been billed by Adomni. Accordingly, had Butler/Till paid CTM's invoice instead of paying Adomni

directly, CTM would have owed the full amount to Adomni without realizing any profit for itself.

45. Adomni has since learned that CTM also improperly obtained Adomni's Client Data through the unlawful actions of Van Blarcom.

46. On May 3, 2023, Van Blarcom received an email at his CTM address from Ashley Lyons, then an Adomni sales representative employee. Using her personal email account, Ms. Lyons sent to Van Blarcom and CTM confidential information concerning the level of reporting needed by one of Adomni's customers with respect to the advertising campaigns it ran.

47. Ms. Lyons' May 3, 2023 email to Van Blarcom included confidential, proprietary information regarding the client's preferences with respect to the customized reports provided to it by Adomni, including a breakdown of the particular information to be included in such reports. The email also relayed pricing information with respect to an ongoing campaign. The information in the email to CTM constitutes Adomni's Client Data, which is maintained as a trade secret.

48. Based on his prior employment with Adomni and by virtue of the Van Blarcom Agreement, Van Blarcom knew that the information he was receiving was proprietary information belonging to Adomni and that CTM had no right to receive such information from Ms. Lyons. Moreover, the fact that Ms. Lyons sent such information from her personal gmail account further confirmed the improper nature of the disclosure, as the use of a personal email account for Adomni related business is strictly prohibited.

49. Upon information and belief, CTM has used the information improperly obtained by Van Blarcom from Ms. Lyons to solicit business from Adomni's customers, and upon

information and belief, has derived unjust benefits and profits to which it is not entitled from the unlawful use of Adomni's Client Data.

50. Upon information and belief, CTM, through the actions of Van Blarcom and Grella, has on other occasions improperly obtained and used Adomni's Client Data, deriving additional unjust business intelligence and profits to which CTM is not entitled and causing damage to Adomni.

51. CTM's misappropriation of Adomni's Client Data causes Adomni irreparable harm for which it has no adequate remedy at law.

## COUNT I
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)**

52. Adomni repeats and realleges the allegations set forth in paragraphs 1-51 with the same force and effect as if set forth fully herein.

53. Adomni's Client Data as described above constitutes trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3).

54. Adomni's trade secrets relate to advertising services used in interstate commerce.

55. Adomni's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. In the highly competitive digital advertising environment, details of the client's working relationship and data, including their preferences regarding campaign setups and reporting, pricing, budgets, profit margins, forecasts, marketing plans and business plans, provides a competitive advantage over competitors who do not have access to such trade secrets.

56. Adomni has taken reasonable measures to protect the secrecy of Adomni's Client Data, including by entering into agreements with its employees, such as the Van Blarcom Agreement and the Grella Agreement, which prohibit the disclosure of Adomni's trade secrets.

57. CTM's actions as described above constitute a misappropriation of Adomni's trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(5). CTM used improper means to acquire Adomni's Client Data and/or knew or had reason to know that Adomni's Client Data was being acquired by improper means, in violation of agreements that CTM's members had made while employees of Adomni and in violation of the obligations of Adomni's current employees to maintain the secrecy of such information.

58. Upon information and belief, CTM disclosed or used Adomni's Client Data without Adomni's consent, through the use of improper means, and CTM knew or had reason to know that Adomni's Client Data was obtained through improper means and/or was derived from persons with a duty to maintain the secrecy of such trade secrets.

59. CTM's actions have caused and will continue to cause damage to Adomni, and unless restrained, CTM will further damage Adomni and cause it irreparable harm.

60. Adomni is entitled to damages for actual losses caused by CTM's misappropriation of Adomni's trade secrets, and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing Adomni's actual losses, or in the alternative, a reasonable royalty for CTM's misappropriation of Adomni's trade secrets.

61. CTM's misappropriation of Adomni's trade secrets was willful and malicious, entitling Adomni to attorneys' fees and exemplary damages.

## COUNT II
### (Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. § 600A.010 et seq.)

62. Adomni repeats and realleges the allegations set forth in paragraphs 1-61 above with the same force and effect as if set forth fully herein.

63. Adomni's Client Data as described above constitutes trade secrets within the meaning of the Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. § 600A.030(5).

64. CTM's actions as described above in unlawfully obtaining and disclosing and using Adomni's Client Data constitutes misappropriation of trade secrets in violation of the Nevada Uniform Trade Secrets Act, § 600A.030(2).

65. Adomni is entitled to damages under Nev. Rev. Stat. § 600A.050 for actual losses caused by CTM's misappropriation of Adomni's trade secrets, and damages for any unjust enrichment caused by the misappropriation that is not taken into account in computing Adomni's losses, or in the alternative, a reasonable royalty for CTM's misappropriation of Adomni's trade secrets.

66. CTM's misappropriation of Admoni's trade secrets was willful, wanton or reckless, entitling Adomni to exemplary damages under Nev. Rev. Stat. § 600A.050, and to attorneys' fees under Nev. Rev. Stat. § 600A.060, for willful and wanton misappropriation.

## COUNT III
### (Tortious Interference with Contract)

67. Adomni repeats and realleges the allegations set forth in paragraphs 1-66 above with the same force and effect as if set forth fully herein.

68. The Van Blarcom Contract and Grella Contract are valid and existing contracts.

69. CTM had knowledge of the Van Blarcom Contract and the Grella Contract.

32240/003/4630386.1

70. CTM's actions in causing Van Blarcom and Grella to solicit Adomni customers that they had serviced during their employment with Adomni, when they were contractually prohibited from soliciting such customers, were intended or designed to disrupt Van Blarcom's and Grella's surviving contractual obligations not to solicit such customers and resulted in actual disruption of the Van Blarcom Contract and Grella Contract.

71. CTM's actions in causing Van Blarcom and Grella to disparage Adomni in violation of the no disparagement clauses of the Van Blarcom Contract and Grella Contract, were intended or designed to disrupt Van Blarcom's and Grella's surviving contractual obligations and resulted in actual disruption of the Van Blarcom Contract and Grella Contract.

72. CTM's actions in causing Van Blarcom and Grella to misappropriate Adomni's Client Data, in violation of their surviving obligations under the Van Blarcom Contract and Grella Contract with respect to Adomni's trade secrets, were intended or designed to disrupt the Van Blarcom Contract and the Grella Contract and resulted in actual disruption of the Van Blarcom Contract and Grella Contract.

73. CTM's actions in inducing the violations described above of the Van Blarcom Contract and the Grella Contract resulted in damage to Adomni.

## COUNT IV
**(Breach of Contract)**

74. Adomni repeats and realleges the allegations set forth in paragraphs 1-73 above with the same force and effect as if set forth fully herein.

75. The CTM MSA constitutes a valid and binding contract between Adomni and CTM.

76. Adomni has duly performed all of its obligations under the MSA.

77. CTM materially breached the CTM MSA, as described above, by failing to pay Adomni the amounts invoiced pursuant to the CTM MSA for CTM's purchase of advertising in the Hershey Campaign.

78. Adomni has been damaged as a result of CTM's breaches in the amount of $139,083.45.

WHEREFORE, Adomni respectfully requests that judgment be entered as follows:

1. Entering a permanent injunction enjoining CTM and any of its officers, agents, members, servants, employees, representatives, parents, subsidiaries, affiliates, divisions, successor and assigns and all those persons in active concert or participation with any of them from using, disclosing or exploiting in any manner Adomni's Client Data or any component thereof.

2. Awarding Adomni damages in an amount to be determined at trial for Adomni's actual losses caused by CTM's misappropriation of Adomni's trade secrets and for any unjust enrichment caused by the misappropriation that is not addressed in computing Adomni's actual losses, plus interest, or in the alternative, a reasonable royalty for CTM's misappropriation of Adomni's trade secrets.

3, Awarding Adomni damages in an amount to be determined at trial for CTM's tortious interference with contract, plus interest.

4. Awarding Adomni $139,083.45 for CTM's breach of the CTM MSA plus pre-judgment interest from the date of CTM's breach.

5. Awarding Adomni punitive and exemplary damages in an amount to be determined at trial.

6. Awarding Adomni its attorneys' fees and costs for this action.

32240/003/4630386.1

7. Granting Adomni such other and further relief as the Court may deem just and proper.

Dated: New York, New York
   May 10, 2023

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.
Attorneys for Plaintiff Adomni, Inc.

By: _____
   Richard S. Mandel
114 West 47th Street
New York, New York 10036
(212) 780-9200
rsm@cll.com