UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADOMNI, INC., <br><br> Plaintiff-<br>Counterclaim Defendant, <br><br> v. <br><br> CLEARTRUST MEDIA, LLC, and CTMEDIA, LLC, <br><br> Defendants-<br>Counterclaimants. | 23 Civ. 10338 (DEH) <br><br> **OPINION AND ORDER** |

DALE E. HO, United States District Judge:

Before the Court are cross-motions for partial summary judgment filed by Plaintiff-Counterclaim Defendant Adomni, Inc. ("Adomni") and Defendant CT Media, LLC ("CT Media") and Defendant-Counterclaimant ClearTrust Media, LLC ("CTM") (collectively, "Defendants"), as well as several motions to seal relevant documents as containing trade secrets. On review of the undisputed factual record, the Court concludes that Adomni is entitled to judgment as a matter of law on its breach of contract claim (Count IV) as well as CTM's counterclaims (Counts I, II, and III). The Court also concludes that disputes of material fact preclude summary judgment on Adomni's other claims. Thus, Adomni's Motion is **GRANTED** in full, while CTM's Motion is **DENIED**. The Court further concludes that the parties' sealing requests are insufficiently specific; they are therefore **DENIED WITHOUT PREJUDICE** to renewal in accordance with the guidance stated herein.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements of Material Facts and are undisputed unless stated otherwise. Adomni provides services that assist in the management of advertising campaigns. Adomni Rule 56.1 Statement ("Adomni Stmnt.") ¶ 2, ECF No. 70.

Adomni offers what is known as a "demand-side platform" that allows marketers to plan, launch and measure digital advertising campaigns. *Id.* ¶ 1. Defendants Cleartrust Media, LLC and CT Media, LLC (collectively, "CTM") were formed in March 2023. *Id.* ¶ 3. CTM describes itself as "a media managed services organization that is engaged in the planning and purchasing of advertising space for its clients." *Id.* ¶ 4. Two of CTM's members are Steven Van Blarcom and Lawrence Grella, former employees of Adomni. *Id.* ¶¶ 5-6. Van Blarcom left the company in 2022 but continued working as an independent consultant until February 16, 2023. *Id.* ¶¶ 7-8. Following termination of his consulting arrangement, he approached Adomni about the possibility of the new start-up company he was co-founding, CTM, forming a commercial relationship with Adomni through which CTM could purchase advertising via the Adomni platform. *Id.* ¶ 10.

Adomni and CTM entered a Media Service Agreement ("MSA" or "Agreement") effective April 7, 2023. *Id.* ¶ 12. The agreement lists both CT Media, LLC, and Cleartrust Media, LLC as parties to the contract. *Id.* ¶ 13. The MSA allowed CTM to purchase advertising inventory from Adomni on "digital out-of-home screens." *Id.* ¶ 14. CTM would then offers services to advertising firms, though what CTM offered that differed from Adomni's services is unclear from the record. Adomni agreed to invoice CTM monthly for all impressions purchased during the prior calendar month, and CTM agreed to pay these invoices within 60 days unless payment from an advertising firm that hired CTM to manage their campaign had not yet cleared. *Id.* ¶¶ 15-16.

The MSA also included multiple termination provisions. Either party could terminate the agreement "for any reason with 90 days notice by email." *Id.* ¶ 17. The agreement also provided under the "Partnership elements" heading that Adomni "has full discretion to revoke access to specific CTM individuals or affiliates (contractors and sub-contractors) for any reason and will provide written notice to CTM." *Id.* ¶ 18.

Pursuant to the MSA, CTM purchased advertising on the Adomni platform for two entities that had prior dealings with Adomni: (1) Hershey (and its advertising agency of record, Horizon Media), and (2) the advertising agency Butler/Till, involving its client State Farm. *Id.* ¶¶ 19-20, 22. These are the only campaigns for which CTM ever used Adomni's platform. *Id.* ¶ 22.

On July 21, 2023, Adomni's counsel sent a letter to CTM terminating the Agreement after Adomni's client, TikTok, informed Adomni that Grella had sought to obtain TikTok's business for CTM, telling TikTok that Adomni was going out of business. *Id.* ¶ 23. Adomni's counsel informed CTM that termination would be effective 90 days from the letter and also provided notice pursuant to the MSA that Adomni was invoking its absolute right to revoke access immediately to the Adomni platform to Van Blarcom, the only CTM user with an Adomni account. *Id.* ¶ 24.

While the Agreement contemplated payment from CTM for Adomni's services, no such payment arrived. Thus, the scope of the Hershey and State Farm campaigns is relevant to potential liability for breach of the Agreement. The Hershey campaign ran between May 15, 2023 and July 9, 2023. *Id.* ¶ 25. The campaign required the delivery of "66 million impressions at a total cost of $675,000." *Id.* ¶ 26. On July 20, 2023, Adomni reported to CTM that the campaign delivered 69 million impressions, therefore exceeding the minimum order threshold. *Id.* ¶ 27. Adomni issued monthly invoices to CTM in June, July and August 2023 in the amount of approximately $675,000 for the impressions purchased during the preceding months in connection with the Hershey Campaign. *Id.* ¶ 29. CTM also invoiced Horizon Media for the cost of advertising placed through Adomni, adding a fee for CTM's services, and Horizon Media paid in full on October 3, 2023. *Id.* ¶¶ 31, 32. However, CTM never paid Adomni. *Id.* ¶ 33. Instead, CTM contacted and paid a third-party contractor for Adomni for the amount owed by Adomni for the Hershey campaign. *Id.* ¶ 34. This total of $535,916.55 was $139,083.45 less than the $675,000 CTM was invoiced by Adomni, representing Adomni's profit margin for its services. *Id.* ¶ 35. This differs

3

from original contemplated payment method where CTM would pay Adomni the full $675,000, leaving Adomni to pay the third-party itself. *Id.* ¶ 36. At some point, CTM decided not to pay Adomni at all. *See id.* ¶¶ 37-38. During litigation, CTM has cited Adomni's failure to produce a "Catalina Study"—a metrics report commonly attached to advertising campaigns—as the basis for withholding payment. *Id.* ¶¶ 39-40. But CTM does not dispute that Adomni did in fact produce such a study and provided it directly to Horizon Media, the intended ultimate recipient of the study. *Id.* ¶ 42.

Turning to the Butler/Till campaign, Adomni had contracted to assist Butler/Till with a campaign on behalf of State Farm before Van Blarcom left to start CTM. *Id.* ¶ 46. Van Blarcom informed Butler/Till that he would be leaving Adomni but stated that CTM and Adomni would partner to execute the State Farm campaign. *Id.* Butler/Till never discussed payment terms with CTM and claims to have understood itself to be working with Adomni. *Id.* ¶ 49. CTM touted its involvement in the State Farm Campaign as providing a "[s]ignificant pricing advantage" for State Farm, assuring Butler/Till that "overall media costs will decrease dramatically" with CTM's involvement. *Id.* ¶ 51. When Butler/Till informed CTM that it "really need[ed] to understand the pricing advantages in greater detail with and without ClearTrust's involvement," CTM responded that the fees paid "would remain the same" as under the original agreement with Adomni, without ever specifying any fee to be paid by Butler/Till to CTM. *Id.* ¶ 52. The Parties dispute whether CTM and Butler/Till ever entered a contract. *Id.* ¶ 54. CTM issued only one invoice to Butler/Till for the same amount that Adomni had invoiced CTM related to the State Farm campaign. *Id.* ¶ 60. When Adomni terminated its agreement with CTM, Adomni informed Butler/Till that Adomni was interested in continuing work on the State Farm Campaign without CTM's involvement. *Id.* ¶ 63. Butler/Till then paid Adomni directly for services relating to that campaign. *Id.* ¶ 66. Butler/Till sent an email to CTM advising it of Butler/Till's decision to move forward with

Adomni on the State Farm Campaign: "Considering that Adomni has previously been administering our campaigns, and considering that we only have paperwork with them (Adomni to Butler/Till MSA) we will be continuing that relationship directly." *Id.* ¶ 67. Butler/Till also indicated its "preference (due to lack of existing agreement / terms between ClearTrust and Butler/Till)" to have Adomni bill Butler/Till directly. *Id.* ¶ 68. Butler/Till stated that it "never signed or agreed to provide any additional compensation to Cleartrust" and "[a]t no point did Butler/Till agree to a compensation arrangement with Cleartust [sic] Media for campaign set up and support." *Id.* ¶ 69.

As a final issue, Adomni alleges that CTM committed trade secrets violations and induced Van Blarcom and Grella to breach several provisions of their prior employment contracts with Adomni. Adomni alleges that CTM misappropriated confidential data that included a digital marketing plan for a currently planned advertising campaign, revealing all the confidential details of what the Adomni media planners had produced, including key metrics such as the targeted budget, number of screens, impressions targets and CPM targets broken down by venue types. *See* Decl. of Jonathan Gudai ("Gudai Decl.") ¶ 5 & Ex. 1, ECF Nos. 77, 77-1; Adomni 56.1 Resp. ¶ 80, ECF No. 75. The data also included a campaign performance report for that same advertiser comparing planned and actually delivered key metrics on a campaign that had just been concluded. *Id.*; Gudai Decl. ¶ 6 & Ex. 2. The tortious interference with contract claim relates to breach of the non-solicitation and non-disparagement clauses in Van Blarcom's and Grella's employment contracts, the alleged breach of which is subject to related litigation pending in Nevada state court.

**LEGAL STANDARD**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)[1]; *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. But the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on

---

[1] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

Adomni filed suit in November 2023, alleging that CTM breached the MSA by refusing to pay invoices relating to the above-described campaigns as well as claims for trade secrets violations and tortious inference.  CTM then filed counterclaims for (1) tortious interference, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing.  The parties both move for partial summary judgment: each affirmatively as to only their own breach of contract claim and both as to all of opposing claims.  On review of the undisputed factual record, the Court concludes that Adomni is entitled to judgment as a matter of law on its breach of contract claim, as well as CTM's counterclaims.  The Court also concludes that disputes of material fact preclude summary judgment as to Adomni's trade secrets and tortious interference claims.  The Court discusses each claim in turn.

### I.    Competing Claims for Breach of Contract

### A.  Breach of Contract

The breach of contract claims are governed by New York law.  *See* CTM Mem. of Law In Opp. to Mot. for Summ. J. ("CTM Opp.") at 4, ECF No. 83.  To successfully bring a breach of contract claim, a plaintiff must establish: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  Both Adomni and CTM claim the other breached the MSA; CTM by failing to make payments, Adomni by

7

revoking CTM's access to the portal. Based on the undisputed factual record, the Court concludes that Adomni is entitled to judgment as a matter of law on the breach of contract claim.

To begin, CTM does not dispute that the MSA was a valid and binding contract, that CTM failed to pay Adomni, and that Adomni suffered damages in the form of lost profits. *See generally* CTM Opp. at 4-10. The only legal dispute is whether Adomni performed its obligations under the contract. The Court concludes that it indisputably did.

As noted above, the MSA provided that either party could terminate the agreement "for any reason with 90 days notice by email." Adomni Stmnt. ¶ 17. The agreement also provided under the "Partnership elements" heading that Adomni "ha[d] full discretion to revoke access [to the portal] to specific CTM individuals or affiliates (contractors and sub-contractors) for any reason . . . ." *Id.* ¶ 18. On July 21, 2023 Adomni provided the 90-day notice terminating the MSA. *Id.* ¶ 23. It also revoked the access to the Adomni portal for CTM, which the contract gave them "full discretion" to do "for any reason." *Id.* ¶¶ 18, 24. In doing so, Admoni did not breach the contract, as it had a clear and unambiguous contractual right to terminate portal access. *See Int'l Klafter Co., Inc. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) (clause permitting termination of contract for "any cause" unambiguously required no reason and permitted termination at will, rendering extrinsic evidence of parties' intent irrelevant). And the Court further notes that CTM's extrinsic evidence of negotiations surrounding ongoing portal access during the 90-day period serves only to demonstrate that this contractual term was thoroughly negotiated and intentionally drafted to grant Adomni the right to revoke portal access immediately. *See* Decl. of Richard S. Mandel in Opp. ("Mandel Decl."), Ex. 5, ECF Nos. 79, 79-5 (discussing negotiations for language "protecting [CTM] from [Adomni] cutting off any ongoing campaigns" that was never adopted).

The Court also concludes that other alleged "breaches" by Adomni of the agreement fail to demonstrate non-performance. While CTM argues that Adomni failed to provide to CTM a

8

required Catalina study, they do not dispute that Adomni provided said study directly to Horizon Media—the entity to whom CTM would have given the study. CTM Opp. at 10. Even if the contract explicitly required Adomni to give the study to CTM and not to Horizon directly, such an immaterial breach would not constitute non-performance. *See, e.g., Catlyn & Derzee, Inc. v. Amedore Land Devs., LLC*, 19 N.Y.S.3d 348, 353 (N.Y. App. Div. 2015) ("A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.").

Because the undisputed facts demonstrate that Adomni performed—or at minimum, substantially performed—its obligations under the MSA, CTM[2] was not excused from its payment obligation. Accordingly, Adomni is entitled to judgment as a matter of law on Count IV of the First Amended Complaint and CTM's first Counterclaim.

### B. Interest

Adomni also seeks prejudgment interest on the outstanding balance of $139,083.45—the difference between Adomni's costs for providing its services for the Hershey campaign and the price charged of $675,000. "[S]tate law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) (citing *Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir. 2000)). New York law provides for prejudgment interest in breach of contract cases at the statutory rate of nine percent per year, dating from the date when the cause of action first came into existence. *See* N.Y. C.P.L.R. §§ 5001, 5004; *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998);

---

[2] Defendants argue that claims against CT Media, LLC ("CT Media") should be dismissed because it does not perform any operational functions and serves only as a holding company. CTM Mem. in Supp. Mot. Summ. J. at 23-24, ECF No. 63-1. However, CT Media was a signatory to the MSA, which listed it as a party to such agreement. *See* Adomni 56.1 Resp. ¶¶ 3-4, 99-100. CTM also effectively serves as a holding company for much of ClearTrust. CTM Opp. at 24. Accordingly, the Court concludes that the claims against CT Media are proper.

*Gao v. Sidhu*, No. 11 Civ. 2711, 2013 WL 2896995, at *4 (S.D.N.Y. June 13, 2013); *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, No. 12 Civ. 8295, 2014 WL 1813748, at *2 (S.D.N.Y. May 7, 2014), *aff'd*, 609 F. App'x 669 (2d Cir. 2015) (summary order). Such interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *CareandWear II, Inc. v. Nexcha L.L.C.*, 581 F. Supp. 3d 553, 558 (S.D.N.Y. 2022) (citing N.Y. C.P.L.R. § 5001(b); *Jamil v. Solar Power Inc.*, 230 F. Supp. 3d 271, 277 (S.D.N.Y. 2017), *aff'd sub nom.*, *Jamil v. SPI Energy Co.*, 713 F. App'x 42 (2d Cir. 2017), *as amended*, (Nov. 29, 2017) (summary order)).

Adomni asks for interest to accrue from October 3, 2023—the date which Horizon Media paid CTM's invoices. CTM did not brief the issue of prejudgment interest, but the Court has considered this issue and finds Adomni's request appropriate. The contract required CTM to pay Adomni's invoices within 60 days unless payment from an advertising firm that hired CTM to manage their campaign had not yet cleared. Adomni Stmnt. ¶¶ 15-16. Adomni invoiced CTM in June, July, and August 2023. While unclear exactly when Adomni invoiced CTM in August, it appears that it had been at least 60 days from each of the invoices when CTM received payment. CTM's obligation to pay Adomni, therefore, began the day Horizon Media paid CTM. Adomni's breach of contract action therefore "existed" on that date. Accordingly, the Court awards Adomni prejudgment interest at the statutory rate from October 3, 2023.

## II.    CTM's Other Claims

CTM also brings two other counterclaims, on both of which Adomni moves for Summary Judgment.  The Court concludes that Adomni is entitled to judgement as a matter of law on both of the remaining counterclaims.

### A.  Implied Covenant of Good Faith and Fair Dealing

"Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994). "As a general rule, '[t]he cause of action alleging breach of [the implied covenant] is duplicative of a cause of action alleging breach of contract." *OHM Remediation Servs. Corp. v. Hughes Env't Sys., Inc.*, 952 F.Supp. 120, 124 (S.D.N.Y.1997) (quoting *Apfel v. Prudential-Bache Sec. Inc.*, 583 N.Y.S.2d  386, 387 (N.Y. App. Div. 1992); *see also, e.g., W.S.A., Inc. v. ACA Corp.*, Nos. 94 Civ. 1868, 94 Civ. 1493, 1996 WL 551599, at *9 (S.D.N.Y. Sept. 27, 1996) (noting that "every court" faced with a complaint brought under New York law alleging both breach of contract and breach of the implied covenant has dismissed the latter claim as duplicative), *modified on other grounds on reconsideration*, 1996 WL 735508 (Dec. 20, 1996).  However, a claim for breach of this covenant "is not duplicative of a breach of contract claim where the complaint alleges conduct that is separate from the conduct constituting the alleged breach of contract and such conduct deprived the other party of the benefit of its bargain." *AEA Middle Mkt. Debt Funding LLC v Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73, 90 (N.Y. App. Div. 2023).

The Court concludes that the claim for breach of the implied covenant is duplicative of the breach of contract claim.  The conduct forming the basis of Adomni's alleged breach of the covenant is identical to that underlying its alleged breach of contract: revocation of portal access and failure to provide a Catalina study.  And the relief sought on the two claims is also identical. Because "[CTM] does not allege that it has suffered damages from [Adomni's] alleged breach of

11

the implied covenant that are distinct from the damages it seeks for breach of the [contract]," CTM's "breach of the implied covenant claim[] is duplicative and must be dismissed." *See Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, No. 98 Civ. 6907, 2000 WL 335557, at *9 (S.D.N.Y. Mar. 30, 2000).

### B. Tortious Interference

Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom. *See Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 218 (S.D.N.Y. 2019) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d. Cir. 2006)). CTM alleges that Adomni caused Butler/Till to breach their contract with CTM relating to the State Farm campaign, causing damages to CTM. This claim fails for multiple reasons.

While there is little evidence of a contract between CTM and Butler/Till, CTM does allege that emails and deposition testimony establish that CTM and Butler/Till worked together on the State Farm campaign, creating a contractual relationship, as a contract need not be in writing under New York law. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506 (2d Cir. 2009). However, these communications are likely insufficient to establish a contract in the absence of pricing terms or any specificity regarding the duration of services. *See Gorodensky v. Mitsubishi Pulp Sales (MC) Inc.*, 92 F. Supp. 2d 249, 256 (S.D.N.Y. 2000) ("Once the price becomes uncertain, the contract becomes devoid of a critical term.").

Even assuming there was a contract, CTM's tortious interference claim fails because they fail to show that Adomni procured Butler/Till's breach of an at-will contract by wrongful means. "Because a properly pled tortious interference complaint also requires a showing of breach,

12

contracts that are terminable at will generally cannot provide the basis for such a claim." *Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909, 2020 WL 1900496, at *8 (S.D.N.Y. Apr. 17, 2020). However, where the defendant employs "wrongful" means to induce the breach, such as "fraudulent representations, or threats[,] or as in violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between them," "the valid contract prong of a tortious interference claim may be satisfied by an at-will contract." *Id.*; *see also Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 451 (N.Y. 1980) ("Where contracts terminable at will have been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful, as consisting of fraudulent representations, or threats or as in violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between them.").

Here, there is no evidence in the record of any such "wrongful" means employed by Adomni. As CTM alleges, Adomni informed Butler/Till that CTM would lose access to the portal on July 21, 2023. CTM 56.1 Stmnt. ¶ 18. But, as discussed, Adomni had a contractual right to terminate this portal access. CTM does not allege—nor does it provide any evidence of—fraud, threats or a violation of a duty of fidelity from Adomni's decision to inform Butler/Till of a factual matter that would be highly relevant to Butler/Till's business interests. In full, CTM argues:

> Here, Adomni's conduct gives rise to an inference of wrongful means. On July 21, 2023, Adomni terminated CTM and simultaneously contacted Butler/Till. This call was not to facilitate a smooth transition but to inform Butler/Till that CTM was immediately cut off from the Adomni Platform and to exploit client sensitivities, leaving Butler/Till with no perceived choice but to abandon CTM. (CTM Counter SOMF, ¶¶36-38.)

13

CTM Opp. at 22.  This is plainly insufficient to meet the level of "fraud" or "threats" required under New York law.  *See Taboola*, 2020 WL 1900496, at *8.  Accordingly, Adomni is entitled to summary judgment on this claim.

### III.    Adomni's Other Claims

CTM also moves for Summary Judgment on Adomni's other claims: two claims for trade secrets violations, and one for tortious interference by CTM in Adomni's contracts with other clients.

### A.  Trade Secrets

CTM seeks dismissal of Adomni's claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Nevada Uniform Trade Secrets Act ("UTSA"), NEV. REV. STAT. § 600A.010 *et seq.* (Counts I and II), on the ground that the client data at issue fails to constitute a trade secret.  Courts frequently analyze federal DTSA claims and state UTSA claims together given their similar elements.  *See* CTM Mem. in Supp. of Mot. for Summ. J. at 4 n.2, ECF No. 63-1; *see also Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21 Civ. 4855, 2024 WL 522751, at *17 n.11 (S.D.N.Y. Feb. 9, 2024).  "The DTSA provides a private right of action for '[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (quoting 18 U.S.C. § 1836(b)(1)).  To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019).

Adomni alleges that CTM violated Adomni's trade secrets protections when it misappropriated confidential data that included a digital marketing plan for a currently planned advertising campaign, revealing all the confidential details of what the Adomni media planners

14

had produced, including such key metrics as targeted budget, number of screens, impressions targets and CPM targets broken down by venue types. *See* Gudai Decl. ¶ 5 & Ex. 1; Adomni 56.1 Resp. ¶ 80. The data also included a campaign performance report for that same advertiser comparing planned and actually delivered key metrics on a campaign that had just been concluded. Adomni 56.1 Resp. ¶ 80; Gudai Decl. ¶ 6 & Ex. 2. Adomni argues that CTM used this data in an unauthorized manner that enabled it to attract and engage with an Adomni client in a more precise manner than it would otherwise have been able to do, including through access to the customer's preferences and other confidential advertising metrics. CTM counters that such data does not constitute a trade secret at all.

The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," so long as: (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *see also Zabit*, 540 F. Supp. 3d at 421. "The existence, vel non, of a trade secret usually is treated as a question of fact," and properly the province of the jury. *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 Civ. 211, 2020 WL 1442915, at *9 (S.D.N.Y. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 1435645 (S.D.N.Y. Mar. 24, 2020). That said, summary judgment may be appropriate "where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being

15

generally known." *Catalyst Advisors*, 2024 WL 522751, at *18 (addressing the propriety of granting a motion to dismiss a DTSA claim); *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023).

As Adomni notes, many courts have concluded that customer preference and pricing data can receive trade secret protection. *See Catalyst Advisors*, 2024 WL 522751, at *21-22 (issue of fact as to non-public information reflecting specific preferences of plaintiff's client companies and target candidates precluded summary judgment); *see also Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."). CTM does not argue that there is no discernible economic value from this information not being generally known. Thus, its motion hinges on establishing no dispute as to a material fact relating to whether the confidential data allegedly misappropriated was or was not "secret."

The Court concludes that summary judgment is inappropriate on this claim. Adomni has provided sufficient evidence to survive summary judgment that the pricing information at issue is confidential and differs substantially from any publicly available pricing information on Adomni's website. *See* Gudai Decl. ¶ 5 & Ex. 1; Adomni 56.1 Resp. ¶ 80. While CTM is correct that Adomni's website pricing information could not be considered secret, Adomni has established an issue of fact regarding whether the information allegedly misappropriated is secret and differs from that publicly available online. A reasonable jury could conclude that the pricing and customer preference information was secret based on the factual record before the Court; thus, summary judgment must be denied.

### B.  Tortious Interference

Unlike CTM's tortious interference claims, Adomni's claims are governed by Nevada law. *See* Adomni Mem. in Opp'n of Mot. for Summ. J. at 9, ECF No. 76. The elements of tortious

interference with contract under Nevada law are: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1184 (D. Nev. 2020). Adomni alleges that CTM induced Adomni's former employees, Lawrence Grella and Steven Van Blarcom, to violate the non-solicitation and non-disparagement clauses in their employment contracts. It is undisputed that Grella engaged in solicitation of Adomni's customers and disparaged Adomni in such communications, including by expressing his frustration with the company and telling people he was concerned how long it would survive. Adomni Mem. in Opp'n to Mot. for Summ. J. at 12. CTM argues that Adomni's claim should be dismissed for three reasons (1) lack of damages, (2) waiver, and (3) duplicative litigation.

### 1. Causation of Damages

As to the first argument, CTM argues that Adomni cannot recover for tortious interference because they fail to provide direct evidence of lost customers as a result of Grella's disparaging remarks about the company. However, Nevada law does not require such evidence. Rather, a jury can properly conclude that a Defendant's conduct led to a disruption of a contract when there is indirect circumstantial evidence of lost clients proximate to the alleged interference. *Frantz v. Johnson*, 999 P.2d 351, 359 n.7 (Nev. 2000). Adomni has put forward significant evidence that Grella made these remarks, and it is reasonable to infer that these remarks would give clients pause when choosing to continue work with Adomni. *See* Deposition of Lawrence Grella at 39:1-43:2, 52:25-72:13, 76:19-79:21, 82:15-90:22, 119:13-15, 137:18-139:8, 141:5-145:8, ECF No. 79-2; Mandel Decl., Exs. 6-15, ECF No. 79-6-79-15. Because Adomni "has put forth a reasonable interpretation of these events," namely that Grella's disparaging remarks led clients to leave Adomni for CTM, "the resolution of such a claim is for the trier-of-fact, not for this Court on a

17

summary judgment motion." *See Renaissance Nutrition, Inc. v. Jarrett*, No. 08 Civ. 800, 2012 WL 42171, at *7 (W.D.N.Y. Jan. 9, 2012); *see also Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

## 2. Waiver

CTM argues that Adomni waived the disparagement and solicitation clauses in the employment agreements when it agreed to work with Grella and Van Blarcom on the Hershey and State Farm campaigns. The Court concludes there is a dispute of material fact regarding waiver.

As an initial note, both employment agreements specifically provide that "[i]f [Adomni] waives any term, provision or breach by me of this Agreement, such waiver shall not be effective unless it is in writing and signed by [Adomni]." Decl. of Sean Rose, Ex. 6 ¶ 22, Ex. 7 ¶ 23, ECF Nos. 64-6, 64-7. The agreements also provide that "[n]o waiver shall constitute a waiver of any other or subsequent breach by me." *Id.* Nevada courts enforce these prohibitions on waiver. *See, e.g., Vegas S. Partners, LLC v. Mandalay Place*, 131 Nev. 1359 (Nev. 2015); *Merrill v. DeMott*, 951 P.2d 1040, 1046 (Nev. 1997) (waiver of rent for one month did not relinquish right to rent generally where lease provided "no waivers by [plaintiff] of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach of [defendants] of the same or any other provision"). And even without these provisions, the fact that Adomni worked with former employees on the Hershey and State Farm campaigns does not, in itself, imply as a matter of law that Adomni waived the non-solicitation and non-disparagement clauses in the agreements, even without a contractual prohibition against such waiver. Accordingly, the Court concludes that waiver cannot provide a basis for summary judgment.

18

### 3. Duplicative Litigation

Lastly, CTM argues that the tortious interference claims should be dismissed as duplicative of a Nevada state court action in which Adomni directly seeks damages from Grella and Van Blarcom for breach of their employment agreements.

A district court has broad discretion to determine the appropriate course for suits that are alleged to be duplicative, including by staying or dismissing the duplicative suit. *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504, 507 (2d Cir. 2019). "Although courts usually avoid duplicative litigation when similar cases are pending in two different federal courts, 'generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter' in a federal court." *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 974-75 (9th Cir. 2011) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see also Kanciper v. Suffolk Cnty. SPCA, Inc.*, 722 F.3d 88, 92-93 (2d Cir. 2013) (dismissal for improper claim splitting where cases pending in federal and state court).

"In *Colorado River*, the Supreme Court held that, in addition to the earlier-established categories of abstention, in certain other exceptional circumstances, a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in comprehensive disposition of litigation and abstention would conserve judicial resources." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (citing *Colorado River*, 424 U.S. at 817-18). "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998). In evaluating whether *Colorado River* abstention is appropriate, federal district courts are to consider six factors, "with the balance

19

heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983):

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001). Where a Colorado River factor is facially neutral, that "is a basis for retaining jurisdiction, not yielding it." *Niagara Mohawk Power*, 673 F.3d at 101.

The Court concludes that *Colorado Rive*r abstention is inappropriate in this case. The parties, while related, are not the same. The state case concerns the employees' actions in their personal capacities, while the claim before this Court relates to the corporate employer's actions in inducing breach. There is no argument that litigating in this forum is inconvenient to the parties. And, if anything, maintaining the Court's jurisdiction over this claim unifies the issues, while abstention would result in piecemeal litigation. The actions were filed at the same time, and this case has progressed further than the state case at the time of briefing in this motion. Decl. of Kory Kaplan ¶ 2, ECF No. 81. And although state law provides the rule of decision, "the absence of federal issues does not strongly advise dismissal, unless the state law issues are novel or particularly complex," which is not the case here. *See Vill. of Westfield v. Welch's*, 170 F.3d 116, 123-24 (2d Cir. 1999). Given the strong presumption in favor of exercising jurisdiction, the Court declines to dismiss Adomni's tortious interference claim.

\*          \*          \*

For the reasons stated above, the Court concludes that CTM is not entitled to summary judgment on Adomni's tortious interference claim.

20

## IV.    Motions to Seal

As a final matter, the parties have filed four unopposed motions to seal various documents associated with the motions for summary judgment.

### A.  Legal Standard

The Court applies a three-part inquiry to determine whether to seal a document. *See Olson v. Major League Baseball*, 29 F.4th 59, 87-88 (2d Cir. 2022). First, a court determines whether a document is a "judicial document," subject to a presumptive public right of access. *See id.* at 87. A judicial document is "a filed item that is relevant to the performance of the judicial function and useful in the judicial process." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).

Second, a court determines the weight of the presumption that attaches to the document, looking to "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Olson*, 29 F.4th at 87-88. "The presumption of public access exists along a continuum. The strongest presumption attaches where the documents determine litigants' substantive rights, and is weaker where the documents play only a negligible role in the performance of Article III duties." *Id.* at 89. However, documents do not "receive different weights of presumption based on the extent to which they [are] relied upon in resolving the motion." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006).

"Finally, once the weight of the presumption has been assessed, the court is required to balance competing considerations against it." *Olson*, 29 F.4th at 88. "[C]ontinued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. Competing considerations may include the protection of "sensitive

21

business information," the release of which could cause a litigant "competitive harm." *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 608 (S.D.N.Y. 2022). "A further countervailing consideration is the privacy interests of innocent third parties which should weigh heavily in a court's balancing equation." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 Misc. 2542, 2023 WL 196134, at *4 (S.D.N.Y. Jan. 17, 2023), *reconsideration denied*, 2023 WL 3966703 (S.D.N.Y. June 13, 2023) (citing *In re Application of Newsday, Inc.*, 895 F.2d 74, 79-80 (2d Cir. 1990)). The court may deny public disclosure of the record only "if the factors counseling against public access outweigh the presumption of access afforded to that record." *Olson*, 29 F.4th at 88.

**B. Application**

The Court is unable to determine whether the documents should be properly sealed on the basis of the letter motions. In total, the parties seek to seal 69 documents, claiming they each contain confidential, commercially sensitive, or proprietary information produced in discovery. However, the Parties fail to meet their burden of demonstrating that "the factors counseling against public access outweigh the presumption of access afforded to [these] record[s]." *See id.* Many of the documents sought to be sealed are simply marked with "Defendants request sealing of document produced in discovery." *See, e.g.*, Second Letter Mot. of Adomni at 2, ECF No. 74. And a select few simply do not contain any type of even debatably proprietary information. *See, e.g.*, Mandel Decl., Ex. 7, ECF No. 80-7 (emails containing a calendar invite and no further information). The motions are therefore denied without prejudice.

The Court, however, will allow the parties to file simultaneous renewed motions to seal within 30 days of this Opinion. Any renewed motion must provide a valid justification for sealing and/or redacting for each document or category of documents subject to such motion. Where a party filed a document under seal solely at the request of opposing counsel, the parties are directed

22

to meet and confer so that the party seeking sealing of that document may address the issue in their renewed motion.  Any proposed redactions must be narrowly tailored to serve interests asserted. To the extent that a moving party believes that any document previously filed under seal may be partially unredacted, the moving party shall file a new version of such document(s) with more limited redactions as exhibits to the party's renewed motion.

If any renewed motion for sealing is filed, the Court will maintain any documents subject to such motion(s) under temporary seal pending resolution of the motion(s).  If no renewed motion for sealing or redaction is filed by the deadline set forth above with respect to some or all of the documents, the Court will direct that such documents be unsealed.

## CONCLUSION

In sum, the Court concludes that Adomni is entitled to judgment as a matter of law on its breach of contract claim (Count IV) as well as CTM's counterclaims (Counts I, II, and III).  The Court also concludes that CTM is not entitled to summary judgment on Adomni's claims for trade secrets violations and tortious interference.  Accordingly, Adomni's Motion is **GRANTED** in full, while CTM's Motion is **DENIED**.  CTM's Counterclaims are **DISMISSED**.

As stated above, the Court concludes that the sealing requests are insufficient and are therefore **DENIED WITHOUT PREJUDICE**.  However, said ruling is **STAYED** pending adjudication of any renewed motion to seal to be filed within 30 days of this Opinion.

Within seven (7) days of this Opinion, the Parties are **ORDERED** to meet and confer. Within 14 days of this Opinion, the parties are further **ORDERED** to file a joint status letter indicating the estimated length of trial on Adomni's remaining claims and the parties' mutual availability for trial in July, August, and September 2026.  The letter shall also state whether parties seek a referral to the District's private mediation program, or to the assigned Magistrate Judge for a settlement conference.

The Clerk of Court is respectfully requested to terminate ECF Nos. 62, 63, 65, 66, 74, and 82.

SO ORDERED.

Dated: March 9, 2026

New York, New York

_____
DALE E. HO
United States District Judge